We have one more case related case to hear this morning. That's Knopf v. Phillips, number 18661. Are you ready, Mr. Berry? Thank you. Please proceed. Well, there's a reason they're being argued in tandem. It's because they're very similar cases. They're based on the same, in part, on the same factual scenario. But these concern different causes of action, right? Different causes of action against different parties. And fraudulent conveyance. But based on the same events. The — on November 20th, just to recount briefly here, on October 22, we asked to just proceed, actually, to focus on the legal arguments. The district court did not hear the tortious interference and fraudulent conveyance. They — she dismissed, right, the tortious interference claim? Right. And this is the suit against the buyer, correct? There are effectively two claims. I mean, there are three, but one of which is essentially mooted because Mr. Phillips has shown that he paid a reasonable value. So the two remaining claims are the actual fraudulent conveyance claim under Debtor Creditor Law 276 and the tortious interference claim. I'd like — because we just — So tell us how the district court erred in her dismissal. Well, the district court erred in rejecting the fraudulent conveyance claim, the intentional fraudulent conveyance claim, because it held that the phone call that we've just been discussing in the other case was not a badge of fraud. And we take the position that it was a badge. But this, of course, is the — again, the suit against the buyer. That's right. So what evidence is there that the buyer, or what you allege that the buyer did that was not in good faith? The buyer was not on that phone call, right? The buyer was not on that phone call. But the — but as Mr. Phillips' own brief concedes, the phone call was made at the behest of his attorney. Ms. Braverman specifically — there's an argument in Phillips' brief. Ms. Braverman, his lawyer, did nothing wrong by suggesting this call. If you look — because she wanted clarification from court personnel. What is incorrect about that? I mean, she — she didn't control how the call was made or whether there was a motion or whether the Knopf's lawyer — or whether you participated in that call. In the record, if you look at the e-mails, she — there was a plan for her to be on the call, including e-mails exchanged a few minutes before the call. All seemed to indicate that she was going to be on the call. And she turned out that she wasn't, or at least not on the hookup that we know about. But she was involved in planning it. She insisted it. It was her idea. And she's a lawyer like Mr. — What evidence is there that she had knowledge that there wouldn't be opposing counsel on the call as well? That it was going to be an ex parte call? What evidence is there of that? Because there was — there's e-mails in the record about setting up the call. Just setting it up doesn't mean that it's not going to have both sides on the call, right? I'm sorry. Judge — Judge Winter, are you there? Yeah, I'm here. Okay. I'm sorry. There must have been some interference pick-up. Okay. Please proceed. There is evidence in the record that they were concerned that we would find out about the sale, that Mr. Phillips was concerned that we would find out about the sale. And it's — it's buried in — in the e-mails. But there was a concern. There's one concern. At one point, Mr. Sanford told Mr. Phillips by e-mail that — or Mr. Phillips' counsel that if the knobs find out about this, they're going to do what they did on Bedford Street, come in, pay the taxes, and then claim — and then file a new notice of penancy based on an equitable subordination claim. Phillips' response to that is, let's get it done. Ms. Braverman knew we were not going to be able to call. There's no — there's — it's impossible for — that she was not — she knows that she's the one who's seeking State action. She's the one who wants clarification from court personnel. It's at her request. Judge Winter is just coughing. But again, I don't think you — just give me a cite to the record, an e-mail, anything in the record that would suggest that Ms. Braverman knew that it would be an ex parte call. What — what e-mail was she — was she told? There's nothing — I don't believe there's anything that — So it's not — it's not bad faith to say, I want — get clarification from the court, right? I want clarification from the court. It's bad faith. There's ample amount of evidence that she wanted to walk in into the appellate division and get — and get an advisory opinion. She was acquiescing in this plan to do it. There was no indication that we were not going to be on — that we were going to be on the call. And when they get this — when she sees the — when she sees the accounts, Mr. Ackerman and Mr. Feldman wrote, she makes it — those accounts make it clear that we were not on the call. Nevertheless, Phillips releases the property knowing that this — that the ruling advisory, ruling advisory opinion they're relying on was — was obtained on an ex parte basis. Phillips actually paid for the motion to vacate the escrow order. He paid Sanford's counsel for it. That motion was denied. And then after that, the emails go dead up until January 11. You don't see anything. Then all of a sudden, Ms. Braverman is on — in communication with title counsel and in communication with Mr. Ackerman and Mr. Feldman and learning that there's this plan for the call. Even if she was assuming that there was going to be — that we were going to be added to the call, there's no — no indication in the record that she was assuming that. She found out after the call that we had not been on the line and she should have known and Phillips should have known. Phillips advised by former — What about — what about Mr. Phillips himself and whether he had actual knowledge or should have known of these plans? What — what evidence is in the record is there? Our position is that there's no evidence that he was in on this in advance, but that under a ruling by Judge — Judge Cote, the — the knowledge of his attorney and the actions of his attorney are attributable to him for fraudulent convictions. Are you relying solely on his lawyer's — Attribution. Okay. With respect to the tortious interference, Judge Cote held that Mr. Sanford had always been desirous of selling these properties, and that, therefore, he had this predilection to sell, and if the party to the contract — if the breaching party to the contract has a predilection to breach it, no tortious interference claim is — is plausible. That's not the law. The many decisions, principally a decision by Judge Shindlin, a decision by Bankruptcy Judge Grossman, and a State court decision by — and a State court decision that we cite in our briefs all specifically say that even a prior breach does not preclude a tortious interference claim. And here, it's important to distinguish between the two — two type — two parts of the contract. There was the promise that he pay — repay the loans or deliver mortgages, and the — the restrictive covenant, which says he can't mortgage it or sell it to anybody else. The restrictive covenant only becomes relevant when he breaches the first obligation by not repaying and not — and not selling to us. Okay. Mr. Berry, the red light's on. Thank you.  Thank you. We'll hear from Ms. Nadel. Good morning, Your Honors. I've been jumping out of my skin here to get up here. Why don't you please adjust the microphone to make sure I'm speaking directly into it. I'm Lorraine Nadel of Nadel & Charlo, here for the appellee, Michael Phillips. And I have a lot to say on all these issues. I'm going to start very quickly with Mr. Berry did not cite any record when he was talking about Laurie Braverman and my client's closing attorney. I didn't know what he was referring to. My client, Michael Phillips, had a closing attorney, Laurie Braverman. She only does closings. She didn't — doesn't do litigation. She didn't know what was going on. And there was an understanding that she would just wanted clarification it was okay to close. That was all she was asking for. Now, I want to just go back to the fact that I think that Eric Berry messed up. You know, he didn't realize that that underlying relief was lifted. In his own brief, he admits that he has this — Judge Winters tried to ask a question. Could you listen, please? Yes. I think you could back up for a minute. You just said an attorney for Mr. Phillips wanted clarification. Was she satisfied with the clarification that she got? Yes, she was, to close. What? Was she informed that the clarification came from a mediation attorney? She would have no idea. She only does closings, real estate closings. She just wanted to make sure that she could be okay to close. She's very careful. I've known her for a very long time. She's just careful. She wanted to make sure it was okay to close. And it was. And the other point I want to make — This doesn't sound very careful to me. Well, I don't know how it can't be careful. It's a basic premise. You know, it's really — Well, but do the camp attorneys — Say it again. Excuse me? Do the camp attorneys have power to clarify our orders? Judge Winter is referring to the mediation attorneys that are on the circuit's staff and that engage in mediation with the parties. And he's asking whether they have authority to clarify the circuit's orders. Okay. I was at Melissa Ringel's deposition when she was questioned. She was very clear that she did nothing on that court. You're answering you don't know about what the camp attorneys have authority to do. But I suspect it's not to interpret our decisions. No, but I do, because there was no question in front of her. There was no legal question. There was no — she had no — she had nothing in front of her but to answer a question about what something means. And as she said at the deposition, it was really just that interim relief ends when the full bench decides the motion. This is a law school comment. That's what she said she told them. I don't see that there's any analysis, any decision, anything advisory. She wasn't involved in anything. And — Who is the she? Eric, very quickly, listen to Judge Winter, please. Who is the she you're referring to? Who is the she you are referring to is Judge Winter's question. I think, Judge, you're talking — are we talking about the law clerk, Melissa Ringel at the appellate division is one person? I don't know who we're talking about. I'm listening to you yell about she when I'm asking you who she is. You're referring — Is it Phillips's attorney who wanted clarification, or is it Ms. Ringel? It was Braverman who was looking to close on this, and she wanted litigation lawyers to just tell her what it meant and it was okay to close, and that was all she did. I mean, she — it's my client's lawyer. She just wanted clarification from other attorneys. She had no idea what was going on with the call. She wasn't part of the call. She wasn't anything other than asking for clarification. Mr. Berry suggested that she learned after the fact that — about the call and that there was something improper about the call, that maybe she may not have known in advance, but after the call they certainly knew something improper was done. What's your response to that? You know, I — with all due respect, I don't see there was anything wrong with the call because nothing changed. The bottom line is — Let's use my premise. Let's use the premise that there was something improper with the call. What evidence is there that — is there evidence that your client knew how the call had taken place? No idea. No. He was a third-party purchaser for value. He was buying an apartment. He bought a one-bedroom condo on 67th Street. How about Ms. Ackerman? What evidence is there that Ms. Ackerman understood who the call was to and the circumstances of the call after the call? What evidence is there of that? It was — there's nothing. There's nothing in the record. I don't know what Eric Berry was referring to. Okay. Okay. I'd also just like to say that the Knopfs have never had a right to this apartment. They have money damages only. They've never had a right to have a piece of it, to be part of it. It's never been anything like that. Regardless of what anyone says, this sale would go forward. Thank you very much. We have the argument. That concludes your time. The red light is on. Thank you. Mr. Sanford, you have five minutes. May it please the Court. Michael Sanford of Pelley. Your Honors, I'm just going to say a couple of things, and then I'd like you, if you would care to, to ask me questions, because I do understand much of the procedural history, and I think there's a lot of confusion, I have to say. If I may, on the Phillips record, there are three pages I'd like just to cite to. A3436, if you would care to jot it down later, look at. A3451 and A3440. They're important quotes that basically crystallize that case. The first one is A3436, if I may. This is from Mr. Eric Berry. This is in the Braun courtroom where I'm in, in state court. He says this, and I put it into the record before Judge Cote to explain his motivations and what's really happening. Quote, unquote, no buyer in his right mind is going to pay full value and walk into this mess. It is inconceivable. Who are you? This is what Mr. Berry said. Yes, Mr. Berry said this on transcript before Justice Braun, trying to get a pre-judgment attachment, which I explained in July 2015 failed. So his argument, which is strange if you think about it, and if you understand the premise of Phillips, is that we sold it for an unfair consideration. That's only after it's sold. But before it's sold, he has a different tactic, which he actually admits readily. No buyer in his right mind is going to pay full value and walk into this mess. I need to comment. He said Sanford is a predilection to selling. This is my home that I found, I purchased, I put the only money down. There was no one else in the contract. It was mine. I was living there. And then I made a transaction, yes, with the Knopf's, and used some of those monies towards the final payment on it. But this is always my home. And as I put in the record before Judge Cote, both Grupo Mexicano and Credit Agricole stand for the proposition that a person's property, they're free to use unless there's a judgment against that person. There was never a judgment against me or pursuit. So he says it's inconceivable. We've noticed dependency at issue for two or three years. Cut and cut, you know, dot, dot, dot. There is no way a buyer is going to come in and say, I'm going to buy this at full price. We then find someone, Hal, Mr. Phillips, who I never met in my life, happens to live in the building. I move out of that condo, and someone from the board says, he wants a different space. You've got a great space. Maybe he'll buy it. He's the only one. Because we couldn't renovate, because there were so many losses, so many threats, everyone was terrified. But after Mr. Phillips bought it, he then got sued, and the claim was insufficient consideration when the corollary before was no one's going to buy it because they're tying it up with liaise penances. So they used a self-help remedy to tie me up. When that didn't work, they sued counsel, Meister Selig, saying taking a contingency mortgage is improper. Then when that didn't work, they put a new liaise penance on, and Judge Coe canceled it, saying that was in bad faith. When that didn't work, they started suing the closing lawyers and every other lawyer they can find. Pursuit went into bankruptcy protection because we couldn't sell the other asset we had because every title company, and this is in the record, a letter from the title company in Phillips, every title company was afraid to insure the other property, which had no notice of penancy on, because they were afraid of being sued by the NAFs. There are only three major title companies in New York, so they brought the value of my asset, which had no judgment at that time, to zero. We put pursuit into bankruptcy, and on the day we do it, Judge Bianco had that case, still had it for decision. Um, 19... It is, uh, Bankruptcy Court before this Court, um, 19-2149. Um, in that, uh, matter, a Dan Osborne pro bono attorney comes in for pursuit to protect pursuit's rights and put it into bankruptcy because we can't do anything else. Maybe a bankruptcy judge will help us. We'll get a trustee or someone to assist us because there's no money. He sues Osborne the day he files the petition, trying to get Osborne to jump out of the case. If that is an obstruction to justice and abuse of process, I don't know what is. They used self-help remedies they had no right to. They went for injunction they had no right to. I know this Court is saying due process, but due process is pursuit and Sanford. We're the ones that Cote said were harassed, and that happened. Berry admitted... Judge Cote. Judge, I'm sorry, yes, I, I, I, yes. Of course, I have the utmost respect for her. I just think of her all the time, so Judge Cote. Judge Cote said, Mr. Berry and the knobs are targeting my attorneys to deprive me of access to counsel, but the key is, without counsel, pursuit can't defend itself. And finally, just to the jurisprudence of this Court, this Court had Diaz v. Patterson, which I quoted when the Liz Penance motion was filed before state court and finally canceled, or whatever, I had to write the affirmation, or the affidavit. I quote Diaz v. Patterson, which is part of this Court's jurisprudence. It cites back to Matthews, and all the concepts about protection of property rights, etc., etc., and due process. Here's the key. There is an offset and a mechanism in New York State that if they don't have proof, documentary form, or they're not acting in good faith, the Liz should be canceled. They never had a secured loan. They never had a mortgage. They never had any of these things. So they had every reason to get it canceled, and there was also the bad faith. But then they were supposed to pay the damages, the notice of penancy, cancellation fees, all the legal fees, by suing the lawyers that moved for that. No one ever moved for that, and that's why Pursuit had to go into bankruptcy. So they've abused every part of the process. Thank you, Your Honors. Thank you for your patience. Mr. Berry, you have two minutes. Okay. The record cites about Braverman's advanced knowledge of the call are at 2857, 2858, and 2859. She's part of the participants of the e-mails that are planning the call. There's nothing in those that indicate that she knew that it was going to be an ex parte call, nothing indicating one way or the other. However, after the call, there was an effort to obtain title insurance, and Phillips himself, and this is our briefs in the record, Phillips said he was letting the title company be the arbiter of whether the sale could go forward. And Phillips' team misled the title company about some important things. There was no disclosure, according to the title company, when deposed, of the grant of summary judgment in the NAF's favor. There was no disclosure to the title company when Mr. Craver, the title company, was deposed, of the December 29 order that the NAF's had to rely upon. There was no disclosure to the title company of the October 22 Judge Sweeney order. This led the title company to inquire further about the status of the case. It looked and saw online that a conference had been scheduled on February 16. So Mr. Craver, the title company, says, why are the conference scheduled if Michael Sanford already won? Mr. Bronfman, Mr. Braverman, passed this question on to Mr. Sanford, and he tells the title company, tells the insurer, that the reason that he won the case and the conference scheduled for February 16 was on his damages. However, on February 8, there had already been a JHO ruling in our favor showing 11. So Philips, Counsel, Bronfman and Braverman, I think Philips himself was on these email changes, acquiesced in misleading the title company. Thank you very much. I think we have the arguments. We certainly have your papers and that is the last argument to be heard this morning. And so the clerk will please adjourn.